**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:20-cv-00790

COMI INVESTMENTS, LLC and SLEEPING SQUIRREL INVESTMENTS, LLC

      Plaintiffs,

v.

KISS INDUSTRIES, LLC and COLE EVANS,

      Defendants.

---

## COMPLAINT

Plaintiffs Comi Investments, LLC ("Comi") and Sleeping Squirrel Investments, LLC ("SSI"), through their undersigned attorneys, Fairfield and Woods, P.C., submit their Complaint against Defendants Cole Evans ("Evans") and Kiss Industries, LLC ("Kiss"), and in support state as follows:

### Parties

1.    Plaintiff Comi is a Colorado limited liability company created by Robert Perry and his wife to manage their investments, including the investment which is the subject of this dispute.

2.    Robert Perry ("Perry") is the majority owner of Comi and manages the entity.

3.    Plaintiff SSI is a Michigan limited liability company created by Erick Perry for the purpose of managing the investment complained of herein.

4.    Erick Perry ("E. Perry") is the sole owner and manager of SSI.

5.    Defendant Cole Evans is an individual residing in or around Denver, Colorado.

6.      Kiss is a Colorado limited liability company with its principal place of business listed as 3222 East 1ˢᵗ Ave, 329, Denver, CO 80206.

7.      Defendant Evans is the registered agent of Kiss.

8.      Since July 2018, Defendant Evans has been CEO and acting principal of Kiss. Since July 2018, Defendant Evans has managed all operations of Kiss.

**Jurisdiction and Venue**

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 in that a claim asserted in this civil action arises under the laws of the United States.

10.     Venue is proper under 28 U.S.C. § 1391(b)(1), (c)(1), and (c)(2) because Defendants are residents of Colorado. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Colorado.

**General Allegations**

**Pre-Investment and Investment**

11.     In late summer, early fall of 2017, Perry was introduced to Defendant Evans at Meridian Golf Club through a personal acquaintance of both men.

12.     From that point up until late summer, 2018 Perry would occasionally encounter Defendant Evans at the Meridian Golf Club.

13.     During these encounters Perry and Defendant Evans would discuss Kiss, including Defendant Evans' role with the company and the company's products.

14.     In early fall of 2018, Perry and Defendant Evans began having serious verbal discussions concerning an investment by Perry in Kiss.

15.     On August 28, 2018, Perry and Defendant Evans had dinner together and discussed

the terms and structure of an investment by Perry in Kiss. Both men also discussed Kiss's future plans, including the production of cannabinoid ("CBD") gum.

16.     On August 29, 2018, Defendant Evans followed up with Perry by text message regarding a potential investment and promised to send Perry a prospectus on Kiss.

17.     Throughout September 2018, Defendant Evans repeatedly followed up with Perry regarding an investment in Kiss. Defendant Evans did not send a prospectus during this period, as he was purportedly working on revising an existing prospectus.

18.     In September 2018, Perry informed Defendant Evans that E. Perry was considering investing in Kiss, and that Perry was relaying the information he was receiving from Defendant Evans to E. Perry for his consideration.

19.     On October 2, 2018, Defendant Evans texted Perry concerning his and E. Perry's potential investments in Kiss. Defendant Evans responded via text message informing Perry he was in the process of collecting information for Perry on Kiss. In addition, Defendant Evans mentioned Kiss's CBD gum product, representing to Perry he already had "some good size CBD Gum P.O.'s in" his email inbox.  *See* Exhibit A, October 2, 2018 text messages between Defendant Evans and Perry.

20.     Upon information and belief, Defendant Evans' representation regarding Kiss already having "some good size CBD Gum P.O.'s in" his email inbox was false. No such purchase orders for CBD gums existed, and if they did, they were not of the magnitude represented by Defendant Evans. A comparison of financial statements for the time in question, discussed below, reflects no such outstanding purchase orders during this time frame. Furthermore, as discussed below, a sizeable CBD purchase order provided to other potential investors during this period was

later revealed to Perry to be false by the customer that purportedly issued the purchase order.

21.     On October 12, 2018, Defendant Evans provided Perry with a Kiss company prospectus ("Prospectus") as well as a profit and loss statement for January 1, 2018 through October 7, 2018 (the "October 2018 P&L").  A copy of the prospectus is attached hereto as Exhibit B. A copy of the October 2018 P&L is attached hereto as Exhibit C.

22.     The Prospectus provided to Perry was false and misleading, as follows:

a.     On page 3, Defendant Evans asserted Kiss was created in 2015. The Colorado Secretary of State's website indicates Kiss was established on August 30, 2016. Defendant Evans was presumably referring to his involvement with a then defunct company called Plova Chewing Gum, LLC ("Plova").

b.     On page 4, Defendant Evans listed "The Key Players" of Kiss. This list was misleading. Tom Hoeltgen, listed as a business partner, is the CEO of a Canadian company called TabLabs and was not a partner of Kiss. Rather Mr. Hoeltgen's company manufactured Kiss products. Similarly, Hank Chang, Danny Schaefer, Bec Koop, and Madlyne Kelly have no known involvement with Kiss, let alone such involvement to label them "Key Players." TC Werner, listed as "Finance Director and Bookkeeper", simply prepared Kiss's taxes.

c.     Page 4 also listed "Current Investors, Advisors & Board Members." This list was misleading, as some of the individuals referenced, such as Kevin Plank and Dan Schimensky, had no role, advisory or otherwise, with Kiss. Defendant Evans involvement with Mr. Plank, the former CEO of Under Armour, stemmed from an entrepreneur competition Defendant Evans entered into with Plova prior to the formation of Kiss.

Neither Mr. Plank nor Mr. Schimensky had any affiliation with Kiss as an investor, advisor, or board member.

d.      Page 5 depicted a number of different companies, labeled as "A Few of Our Brand Partners." This depiction was misleading as a number of the companies depicted had minimal to no interaction with Kiss. Furthermore, there are no brand partnership agreements of any sort with these companies. This includes but is not limited to Dunkin' Donuts, the Los Angeles Clippers, the Golden State Warriors, the Dallas Mavericks, and the Denver Nuggets. The majority of the remaining companies had little to no interaction with Kiss, and certainly not enough to be labeled "Brand Partners."

e.      Page 6, labeled "Where We've Been Featured," is misleading, as Kiss appears to take credit for features pertaining to Plova. For example, Kiss was never featured in the San Antonio Business Journal; that was Plova.

f.      Page 13 represented Kiss's gum product, Confadent, had a proprietary formula comprised of FDA-approved ingredients commonly present in other leading brands. This was false, Confadent's formula contains ingredients not approved by the FDA and no aspect of Confadent's formula has ever been approved by the FDA.

g.      Page 14, labeled "Our Kiss Industries Technology," is misleading. The page created the impression the compression technology discussed belongs to Kiss, when in reality it belongs to TabLabs. Kiss cannot manufacture its gum without permission from TablLabs, who owns the patents involved with the compression technology. As of July 2019, Kiss did not have a license to manufacture its gum in the US utilizing this technology.

h.      Page 16, labeled "Revenue Lines," is misleading. This page creates the

impression a number of high end companies, like Dunkin' Donuts, are customers of Kiss. None of the companies depicted are customers of Kiss.

    i.    Upon information and belief, a number of statements made on Page 19, labeled "Our CBD Gum," were false or misleading. Kiss represented it developed a CBD gum and breath mint prototype in partnership with TabLabs. However, as Perry would learn over the following months, assuming a prototype had been created, TabLabs was likely unaware it had developed CBD gum for Kiss or that it was importing such a product across the US / Canadian border. The manufacture of such a product would have resulted in the potential shutdown of TabLabs manufacturing facility.

    j.    Page 20, labeled "Proposed Manufacturing Facility," contained false and misleading statements. Page 20 references an existing Kiss production facility capable of generating in excess of 2 million tablets per hour. This was false, no such licensed and legally compliant facility existed at the time to generate tablets, nor does such a facility exist today. In addition, page 20 stated upon completion of a new manufacturing facility Kiss "[w]ill be the only dry compression chewing gum & breath mint facility in the United States due to our global patents." As Defendant Perry would later discover, Kiss has never owned any global patents, and did not even have licenses, exclusive or otherwise, to utilize the necessary patents to independently manufacture its products at this point in time. As discussed below, during Perry's tenure with Kiss, he discovered Kiss had not even begun negotiations to secure the necessary licenses by this point in time.

23.    Upon information and belief, the October 2018 P&L was false and misleading, specifically with respect to the listed amount of gross profit, $296,854.89.  This number is believed

to be inflated on account of the "Cost of Goods Sold" number of $61,036.11 being significantly understated. Perry's later involvement with the business, as well as discussions with former manager Keith Burge, would reveal Defendant Evans and Kiss kept poor records that made it difficult to accurately calculate the costs associated with the sale of Kiss products.

24.     In the October 12, 2018 email from Defendant Evans to Perry, Defendant Evans made a number of false and misleading statements. A copy of the October 12, 2018 email, as well as other emails communications between Defendant Evans and Perry, is attached as Exhibit D.

a.      Defendant Evans stated Kiss was "currently manufacturing VERY LARGE additional orders for OMNI Hotels and Resorts, HYATT Hotels and Resorts and even PERRY'S STEAKHOUSES …. Those orders total over $600K of additional revenue to our business this year, which will take the revenue well over $1M with just the regular chewing gum and breath mint business (not including the new CBD sector of our business." Upon information and belief, no such orders existed, and if they did, such orders did not total over $600,000.00 of additional business.

b.      A November 15, 2018 Kiss balance sheet (the "November Balance Sheet"), which Perry recently obtained from other investors, does not reference any account receivables, let alone $600,000.00 of additional orders.[1] The October 2018 P&L reflects sales of only $357,891.94. A November 15, 2018 profit and loss statement (the "November 2018 P&L") obtained from other investors reflects sales for $695,225.37, a one-month difference of approximately $350,000.00. As such, the purchase orders referenced by Defendant Evans in the October 12, 2018 email could not have been fulfilled during this

---

[1] While dated November 14, 2018, the balance sheet has a performance time stamp of November 23, 2018.

time frame, and since these purchase orders were not listed on the November Balance Sheet as an account receivable, these purchase orders never existed. A copy of the November Balance Sheet is attached hereto as Exhibit E; a copy of the November 2018 P&L is attached hereto as Exhibit F.

      c.      Defendant Evans further states, "I already have P.O.'s for over $1M for CBD infused chewing gum and breath mints, so we are very excited to get our tight little production facility put together this fall." Defendant Evans did not have legitimate purchase orders totaling over $1M for CBD chewing gum and breath mints, and did not have any plans in place to feasibly put together a production facility for Kiss in fall 2018.

      d.      The November Balance Sheet did not reference any account receivables, let alone an account receivable for a $1,000,000.00 purchase order for CBD infused chewing gum and mints. The October 2018 P&L reflects sales of only $357,891.94. The November 2018 P&L only reflected sales for $695,225.37, a difference from October of approximately $350,000.00. As such, this purchase order was not fulfilled during this time frame, and since it was not listed on the November Balance Sheet as an account receivable, this purchase order never existed.

      e.      Defendant Evans further stated, "I already have two other high net worth individuals who I [sic] have committed the necessary funding for the factory build out. These two gentlemen are large investors (150M+) in the cannabis industry already and have significant relationships with our soon to be CBD customers.  One of them is also an Augusta National Golf Club member …."

      f.      In fall 2018, no one, let alone two high net worth individuals, had committed

the necessary funding for the factory build out and no Kiss investors existed matching this description. Upon information and belief, the two investors referenced by Defendant Evans were only potential investors named Mario and Elliot, and had not yet committed (and never actually committed) any money to Kiss, let alone had already committed as of October 12, 2018, the necessary funding for the Kiss factory build out.

g.      Those individuals were not formally approached by Defendant Evans to be potential investors until December 2018. A prospectus was prepared and provided to these potential investors containing a December 8, 2018 purchase order for $3,164,275.00 from a company called Colbie Supply. This purchase order was false. A February 2020 discussion between Perry and Bill Monroe, a principal of Colbie Supply and the purported signatory of the Purchase Order, revealed no such purchase order was ever issued by Colbie Supply and the purchase order in question was a forgery. This purchase order is just further evidence of a pattern of conduct by Defendant Evans of misrepresenting the existence of sizeable CBD purchase orders to potential Kiss investors, including Plaintiffs. A copy of the prospectus sent to these investors is attached hereto as Exhibit G.

25.    On or around October 20, 2018, Perry sent Defendant Evans a list of 21 questions related to a potential investment in Kiss. A copy of the list of questions is contained in Exhibit D.

26.    On October 24, 2018, Defendant Evans responded to the list of questions. A copy of Defendant Evans' response is contained in Exhibit D.

27.    A few of Defendant Evans' responses were false and misleading, as set forth below:

a.      In response to question number 2, which asked about the lifespan of Kiss products, Defendant Evans asserts the lifespan of the products were 5 years. As a result,

Defendant Evans claimed "[t]his long lifespan is helping us in a major way to get involved with the U.S. and foreign Armed Forces insider their ration kits and MRE's [sic]."

b.      Upon information and belief, Kiss's breath mint and gum products do not have a 5-year life span, and Kiss has not had serious conversations, if any, with the "U.S. and foreign Armed Forces" about having Kiss products become part of their ration kits and MREs. Perry would learn through his association with Kiss, and discussions with former Kiss management, Keith Burge, and other Kiss investors, that Kiss never performed any formal testing as to the lifespan of its products. With respect to discussions about getting involved with the U.S. and foreign Armed Forces, Perry would learn Defendant Evans was referring to discussions he had with another member of Meridian golf course that was associated with the US military. Those discussions were never serious, and never reached any sort of formal discussion about Kiss products being part of ration kits or MREs.

c.      In response to question number 5, which asked who owned the relevant Kiss patents, and at what percentages, Defendant Evans made a number of false statements:

i.      Defendant Evans asserts his business partner, Tom H. (presumably Tom Hoeltgen of TabLabs), owned certain manufacturing process patents and had granted KISS with the exclusive U.S. license for multi-layer chewing gum patents. This statement is false. Tom Hoeltgen is not a partner with Defendant Evans or Kiss, but rather manufactured gum for Kiss. In addition, at this point in time, Kiss did not have an exclusive license to these multi-layer chewing gum patents, and upon information and belief does not have such a license to date.

ii.     Defendant Evans asserts the specialized process by which Kiss gum

is manufactured "allows us to manufacture products that contain the exact amount of active ingredients in each piece that the consumer wants. To further this - if we say that there are 10MG of CBD per piece of gum, there is exactly 10MG." Customers of Kiss that have tested the exactness of the contents of gum manufactured for them by Kiss have complained that the gum was not manufactured pursuant to the agreed upon specifications. The February 2020 discussion with Bill Monroe, referenced above, revealed Mr. Monroe has a dispute with Kiss regarding products that were not manufactured pursuant to the agreed upon product specifications, amongst other issues.

iii.     Defendant Evans asserts, "My company KISS INDUSTRIES has the exclusive license to the U.S. for cannabinoid infused chewing gum. This exclusive license to the patent is a formation patent, which describes how we are the only company that can infuse cannabinoids into chewing gum." At the time, Kiss did not have the exclusive license in the U.S. for CBD infused chewing gum. As discussed below, Kiss did not receive a license to start manufacturing CBD infused chewing gum until July 2019, and said license was not exclusive.

iv.     Defendant Evans asserts, "We have the license for the manufacturing process patent for the next 11 years until 2029, and we have the license to the formulation patent until 2027." For the reasons set forth above, these statements were false. No such licenses existed.

d.     In response to question 6, which concerned Kiss's future business plans after patent expiration, Defendant Evans made false and misleading statements:

i.      As an initial matter, Defendant Evans' entire response is premised on the representations made in response to question 5, that Kiss owned or had exclusive rights to the patents in question. As discussed above, such representations were false, as Kiss owned no such patents and did not have the necessary licenses.

ii.      Defendant Evans asserts Kiss "will be first to market with the CBD and cannabinoid infused chewing gums and other products." This statement was false as Kiss did not have access to any patents necessary to manufacture CBD gum or other CBD products, and was not first to market as of this date.

iii.      Defendant Evans asserts, "On our board of governance, we have the former Global President for MONDELEZ which owns the brands: Dentyne, Stride, Trident, etc. and he has informed us that MONDELEZ nor WRIGLEY has any interest in getting into the compressed chewing gum market." Upon information and belief, this statement is false. Kiss does not have a board of governance, nor is it believed that the former Global President for Mondelez ever made any such statement about the future business plans of his former company.

e.      In response to question 7, which inquired into the ownership percentages of Kiss and certain aspects of the business, Defendant Evans asserts he owned 95% of Kiss and one other individual owned 5%. This is false. One of Defendant Evans' former partners, Keith Burge, asserts he is still a 47.5% owner of Kiss, and asserts Defendant Evans forged documentation conveying his interest to Defendant Evans.

f.      In response to question 7, Defendant Evans provided a calculation detailing how an investment through a convertible loan arrangement translates into potential

ownership of Kiss by that investor, and the amount of potential recovery. Defendant Evans failed to mention a number of individuals comprised of former employees and contractors have profit interests in Kiss, diluting the potential ownership interests of potential investors. By this point in time, approximately 35% of Kiss profit was subject to such interests and would need to be taken into consideration in valuing the company.

g.      In response to question 14, which asked for the break-even point for the new building and venture, Defendant Evans asserts the expected break-even for the new building was to happen before the end of 2019, assuming Kiss is producing product before the end of January. This statement was misleading and false given Kiss had taken practically no steps as of October 24, 2018 to secure a location for the proposed manufacturing facility, had not obtained necessary licenses to run the facility, and had not even started negotiations on, let alone received, the necessary patent licenses to manufacture its products or the proposed CBD products.

h.      In response to question 15, which asked about the patents utilized by Kiss, Defendant Evans asserts Kiss had exclusive licenses on certain patents "for a timespan of (11 years process) and (9 years formulation). For the reasons set forth above, those statements were false, as no such licenses existed.

i.      In response to question 17, Defendant Evans made a number of statements which upon information and belief were false:

i.      Defendant Evans asserts Kiss was "currently forming a partnership on the regular gum and mints side of things through U.S. Foods and Sysco. They will be our distribution partners in 1st quarter of 2019." Upon information and

belief, no such discussions occurred in fall 2018. U.S. Foods and Sysco have never distributed Kiss products. Perry is unaware of any discussions occurring with these major national food distributors to distribute Kiss products. Moreover, given the relatively small volume of products manufactured by Kiss, at this point in its business lifecycle there is no way Kiss could have produced the volume of product necessary to distribute under these companies.

ii.     Defendant Evans asserts, with respect to "cannabinoid infused chewing gum and breath mints, we already have $1.4 Million in pre-orders and we haven't made one outbound sales call." Kiss did not have $1.4 Million in pre-orders for CBD gums and breath mints as of fall 2018, for the reasons set forth above regarding the financial statements of Kiss and later investigation into the matter by Perry.

j.     In response to question 20, which asked whether the two different types of production were legal and illegal in the same building/property, Defendant Evans made a number of misstatements:

i.     Defendant Evans asserts Kiss's building already had a "MIP" license and could produce THC infused gum/mints. This statement was false, Perry would learn only a few months later Kiss did not have and has never had a valid "MIP" license and could not co-produce Kiss's regular products in the same facility as THC based products.

ii.     Defendant Evans further asserted Kiss's building was already licensed and approved to produce THC products. This was false. First, Kiss did not

have a manufacturing facility at this time, and the packaging was being done at a building owned by a different company. Second, Kiss had no such license from Colorado's Marijuana Enforcement Division ("MED"). A review of the list of product manufacturers maintained by the MED reveals Kiss is not a licensed manufacturer of THC products.

28.     Given the context in which these responses were provided, specifically to an investor requesting information about Kiss and its products, and the number of false and misleading statements, Defendant Evans clearly drafted these responses with the intent to deceive Perry into investing in Kiss.

29.     Relying on the documentation provided to him and the representations made to him, on November 1, 2018, Perry informed Defendant Evans the Plaintiffs were going to invest in Kiss.

30.     On November 5, 2018, Defendant Evans provided Perry with a number of legal documents, including a convertible loan agreement, note purchase agreement, and board of director's agreement. A copy of the executed versions of these documents is provided hereto as Exhibit H.

31.     Initially, Perry was going to invest $350,000.00 and E. Perry was going to invest $150,000.00. However, in early November 2018, E. Perry could not go forward with the investment, leading Perry to invest the total $500,000.00.

32.     On November 27, 2018, Perry invested $500,000.00 in Kiss through Comi. The investment was structured as a convertible loan that guaranteed a 6% return on the investment, which could be converted to an ownership interest in Kiss.

33.     Defendant Evans was aware Perry's long term plan was to convert his loan in Kiss

to equity. Numerous emails and text messages exchanged between the parties indicate this was not a simple loan arrangement, but rather a long time investment directly in Kiss. This is made rather clear in Defendant Evans' comments in response to the list of questions sent to him by Perry, contained in Exhibit D.

34.     Comi investments wired Kiss $350,000.00 on November 27, 2018. The remaining $150,000.00 was sent the next day.

35.     On December 12, 2018, Perry informed Defendant Evans via text message that E. Perry was able to invest in Kiss. A copy of this text message chain is attached hereto as Exhibit I.

36.     In the same text message chain, Defendant Evans responds he "had lunch with CEO of Trader Joe's today and he wants our regular gum and mints along with our CBD products in Trader Joe's." Upon information and belief, this statement was either false or a gross exaggeration of the desire of Trader Joe's CEO to sell Kiss products in Trader Joe's stores. Kiss products have never been sold in Trader Joe's stores.

37.     On January 4, 2019, Defendant Evans sent an email to Perry attaching the investment documents for E. Perry. E. Perry elected to utilize a limited liability company to hold the investment.  A copy of the January 4, 2019 email is attached hereto as Exhibit J.

38.     E. Perry's investment was structured as a convertible loan with a guaranteed rate of return, which could be converted to an ownership interest in Kiss. E. Perry did not view this investment as a simple loan transaction, but rather a long term investment directly in Kiss.

39.     In his January 4, 2019 email, Defendant Evans stated, "I spoke with Tom H at Tablabs yesterday and our cannabis attorney Patrick Goggin and Tom is on board to manufacture the chewing gum / mint orders infused with organic hemp derived CBD in Canada and ship them

down to the states. We will have the pay a customs fee for importation, but it doesn't appear to be a huge issue at all in the grand scheme of things."

40.    This statement was false and misleading. TabLabs was never "on board" to manufacture product orders utilizing CBD, regardless of where it was sourced, and import those products into the United States.  As Perry would later learn, any such production by TabLabs could result in TabLabs losing its manufacturing license. Moreover, while legal, importation of CBD into the United States is a significantly more difficult process than stated by Defendant Evans.

41.    On January 7, 2019, E. Perry, through SSI, executed the transaction documents. A copy of the executed transaction documents is attached hereto as Exhibit K.

42.    On January 15, 2019, E. Perry, through SSI, wired $150,000.00 to Kiss.

**Post Investment and Miscellaneous**

43.    Initially, Defendant Evans welcomed the assistance of Perry with respect to the operations of Kiss, even going so far as to request Perry be a board member of Kiss.

44.    On December 24, 2018, Defendant Evans and Perry met in person to discuss future plans. During this meeting, Perry became aware that Kiss's plans to acquire and setup its own manufacturing facility were still in its infancy, with no property having been selected, no loan inquiries having been made, and no research having been performed on the process to obtain necessary licenses.

45.    Over the next few months, Perry assisted Defendant Evans in locating and setting up site visits at potential properties for Kiss's manufacturing facility. Through a litany of excuses, Defendant Evans essentially ignored this assistance and failed to locate an adequate location for Kiss's manufacturing facility.

46.   On March 25, 2019, Defendant Evans sent Perry and a number of other Kiss investors an email seeking to set up a call to discuss patents and the "facility plan."

47.   On March 28, 2019, Defendant Evans, Perry, and a number of other Kiss investors met to discuss patents and the "facility plan." Over the course of the meeting it became apparent Kiss did not have any "exclusive" licenses with respect to any patents, and had just started negotiations with respect to a license to manufacture CBD infused chewing gum. A copy of email exchanges containing notes of the meeting is attached hereto as Exhibit L.

48.   From May 16, 2019 to May 19, 2019, a number of emails were exchanged involving Defendant Evans, Perry, and other investors of Kiss concerning Kiss obtaining a license to use AXIM Biotechnologies' ("Axim") CBD infused chewing gum patent. The communications indicate discussions to obtain the license were still preliminary, and a number of questions and issues still needed to be resolved prior to execution. A copy of these email communications is attached hereto as Exhibit M.

49.   On or around June 18, 2019, Kiss had a board meeting in Colorado. Investors were invited to attend. At the board meeting, a significant number of investors raised questions on the Kiss financials and unsupported statements by Defendant Evans that Kiss had received a $1.3M purchase order that would be paid on July 1, 2019.  Upon information and belief, no such purchase order existed based on the fact that it was never produced to the investors, despite multiple demands, and Kiss financials never reflected such a purchase order.

50.   On June 28, 2019, Perry visited Kiss's office. Amongst other things, Perry was alarmed to find out that Kiss had not yet transitioned to QuickBooks, was lacking a number of licenses for its "facility," and did not appear to be in compliance with local and federal

requirements.

51.     On July 1, 2019, Kiss and Axim executed a Licensing and Manufacturing agreement granting Kiss a non-exclusive license to manufacture non-pharmaceutical grade material in exchange for royalties and other concessions from Kiss, including the construction of a chewing gum manufacturing facility in the State of Colorado.

52.     On July 3, 2019, Defendant Evans sent an email to Perry and other investors notifying them Kiss had executed an agreement with AXIM to obtain a non-exclusive license to manufacture CBD and THC infused chewing gum. In addition, Defendant Evans' email noted he was still in discussion with TabLabs to obtain a license to allow Kiss to manufacture multi-layer chewing gums in the US. Lastly, Defendant Evans informed the investors Kiss would not be utilizing the manufacturing facility recently toured, and instead would seek a new facility. A copy of this July 3, 2019 email is attached hereto as Exhibit N.

53.     Throughout the first two weeks of July 2019, Kiss investors, including Perry, pressured Defendant Evans to provide documentation regarding Kiss financials, including account receivables and purported multi-million dollar purchase orders.

54.     On July 11, 2019, the investors demanded a meeting with Defendant Evans to discuss financials and other concerns the investors had regarding the management of Kiss.

55.     On July 12, 2019, Defendant Evans responded, informing the investors they had no right to manage or participate in the day-to-day management of the company. Defendant Evans refused to organize a meeting. In addition, Defendant Evans attempted to rescind Perry's director position with Kiss.

56.     After July 12, 2019, the relationship between the Plaintiffs (as well as other

investors) and Defendant Evans deteriorated, in part after issues arose concerning possible fraudulent import/export of Kiss products from Canada, falsified documentation to customers, falsified purchase orders, shipment of products technically containing THC/CBD across state lines, misstatements in financials presented to investors, and lack of a compliant manufacturing facility.

### First Claim for Relief

(Violation of Section 10(b) and Rule 10b-5 Promulgated Thereunder)

57.     This Count is asserted against Defendants based upon Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.     As detailed above, Defendants Evans and Kiss directly or indirectly disseminated false and misleading statements to Plaintiffs, which they knew were misleading in the course of a securities transaction. The statements were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     The misrepresentations made by Defendant Evans and Kiss were disseminated in part utilizing instrumentalities of interstate commerce, including but not limited to telephonic phone conversations, telephonic text messages, and the internet.  In addition, the investments made by the Plaintiffs were transmitted through bank wire transfers.

60.     Perry and E. Perry believed and expected representations and the contents of the documents sent to them were accurate and reliable.

61.     Perry relied on the information provided to him by Kiss and Defendant Evans in determining whether to invest in Kiss.

62.     E. Perry relied on the same information, some of which was provided directly to him, but the majority of which was provided to him indirectly through Perry.

63.     Plaintiffs were not aware at the time of their investments that material information in the representations and documents were false and misleading.

64.     Defendant Evans and Kiss acted with scienter in that they knew and were aware the information there were providing to Perry and E. Perry through the aforementioned representations and documents were materially false and misleading, including but not limited to non-existent purchase orders, non-existent customers, and non-existent manufacturing and patent licenses.

65.     As the head of operations, principal of Kiss, and CEO, Defendant Evans was in a position to know that representations he made to the Plaintiffs on behalf of himself and Kiss on these topics were false and misleading.

66.     Defendant Evans and Kiss made these representations and provided these documents to Plaintiffs with the expectation that they, as potential investors, would review and rely on them in their decision to invest in Kiss.

67.     On common sense alone, Defendant Evans and Kiss knew that such information being provided to Plaintiffs would be material to an investors' decision on whether to invest. The existence, or lack thereof, of valid manufacturing patents and licenses is material to any potential investor of a manufacturing company. Similarly, information containing company sales and future sales would be material to any potential investor of a manufacturing company.

68.     Defendant Evans and Kiss intended for Plaintiffs to rely upon these false and misleading representations and documents, as they were provided in conjunction with discussions concerning Plaintiffs' decision to invest.

69.     Plaintiffs relied upon these false and misleading representations and documents in evaluating and ultimately electing to invest. If they had known the true state of Kiss, Plaintiffs would not have chosen to invest in the company.

70.     Plaintiffs were damaged in an amount to be proven at trial by their justifiable reliance on Defendants' false and misleading representations and documents, including but not limited to the amount of their investments in Kiss.

## Second Claim for Relief

(Fraud in the Sale of Securities – C.R.S. § 11-51-501)

71.     As detailed above, Defendants Evans and Kiss directly or indirectly disseminated false and misleading statements to Plaintiffs, which they knew were misleading in the course of a securities transaction. The statements were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

72.     Perry and E. Perry believed and expected representations and the contents of the documents sent to them were accurate and reliable.

73.     Perry relied on the information provided to him by Kiss and Defendant Evans in determining whether to invest in Kiss.

74.     E. Perry relied on the same information, some of which was provided directly to him, but the majority of which was provided to him indirectly by Perry.

75.     Plaintiffs were not aware at the time of their investments that material information in the representations and documents were false and misleading.

76.     Defendant Evans and Kiss acted with scienter in that they knew and were aware the

information there were providing to Perry and E. Perry through the aforementioned representations and documents were materially false and misleading, including but not limited to non-existent purchase orders, non-existent customers, and non-existent manufacturing and patent licenses.

77.     As the head of operations, principal of Kiss, and CEO, Defendant Evans was in a position to know that representations he made to the Plaintiffs on behalf of himself and Kiss on these topics were false and misleading.

78.     Defendant Evans and Kiss made these representations and provided these documents to Plaintiffs with the expectation that they, as potential investors, would review and rely on them in their decision to invest in Kiss.

79.     On common sense alone, Defendant Evans and Kiss knew that such information being provided to Plaintiffs would be material to an investors' decision on whether to invest. The existence, or lack thereof, of valid manufacturing patents and licenses is material to any potential investor of a manufacturing company. Similarly, information containing company sales and future sales would be material to any potential investor of a manufacturing company.

80.     Defendant Evans and Kiss intended for Plaintiffs to rely upon these false and misleading representations and documents, as they were provided in conjunction with discussions concerning Plaintiffs' decision to invest.

81.     Plaintiffs relied upon these false and misleading representations and documents in evaluating and ultimately electing to invest. If they had known the true state of Kiss, Plaintiffs would not have chosen to invest in the company.

82.     Plaintiffs were damaged in an amount to be proven at trial by their justifiable reliance on Defendants' false and misleading representations and documents, including but not

limited to the amount of their investments in Kiss.

### Third Claim for Relief

(Fraud in the Inducement)

83.    As detailed above, Defendant Evans and Kiss knowingly made false and misleading statements in a number of communications and documents provided to Plaintiffs in connection with a possible investment in Kiss.

84.    These false and misleading statements were made with the intention of inducing Plaintiffs to invest in Kiss.

85.    If these false and misleading statements had not been made, Plaintiffs would not have invested in Kiss.

86.    As a result, Plaintiffs have been damaged in an amount to be proven at trial, including but not limited to the amount of their investments in Kiss.

### Fourth Claim for Relief

(Negligent Misrepresentation – Alternative Claim for Relief)

87.    In the event the complained of misrepresentations made by Defendant Evans and Kiss were not made with knowledge of their falsity, said statements were made in a negligent and reckless manner.

88.    As set forth above, said statements were made in a number of communications and documents provided to Plaintiffs in connection with a possible investment in Kiss.

89.    These statements were made with the intention of inducing Plaintiffs to make an investment in Kiss.

90.    If these statements had not been made, Plaintiffs would not have invested in Kiss.

91.     As a result of these statements, Plaintiffs have been damaged in an amount to be proven at trial, including but not limited to the amount of their investments in Kiss.

## REQUEST FOR RELIEF

WHEREFORE, as to all Claims for Relief, the Plaintiffs pray for judgment against Defendants as follows:

(a)     Rescission of their investments or in the alternative damages to be proven at the time of trial including but not limited to economic and non-economic damages;

(b)     Pre and post judgment interest;

(c)     For costs and attorneys' fees recoverable by statute; and

(d)     For such further and necessary relief as the Court deems just and proper.

## PLAINTIFFS DEMAND A TRIAL BY JURY

RESPECTFULLY SUBMITTED this 25th day of March, 2020.

FAIRFIELD AND WOODS, P.C.

*/s/     Adrian P. Castro*
Adrian P. Castro, Atty. Reg. No. 42028
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 894-4458
Fax: (303) 830-1033
Email: acastro@fwlaw.com

*Counsel for the Plaintiffs*

Plaintiffs' Addresses:

Comi Investments
9111 Weatherstone Ct.
Highlands Ranch, CO 80126

Sleeping Squirrel Investments, LLC
8944 Q Avenue
Mattawan, MI 49071